**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CRAIG BLAKNEY,** | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 04-CV-07912** |
| **v.** | ) | |
| | ) | **HONORABLE DAVID H. COAR** |
| **KEVIN WINTERS,** | ) | |
| **(current warden KEITH ANGLIN),** | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

Before this Court is a petition for the writ of habeas corpus filed pursuant to 28 U.S.C.

§2254 by Craig Blakney ("Petitioner"), who is currently incarcerated at the Danville Correction

Center in Danville, Illinois under the supervision of Warden Keith Anglin. For the reasons

stated below, the petition is **DENIED**.

## BACKGROUND[1]

Following a bench trial, Petitioner was convicted of two counts of attempted first degree

murder of a peace officer, two counts of attempted first degree murder, three counts of

aggravated discharge of a firearm, two counts of aggravated battery with a firearm and two

counts of attempted armed robbery. He was subsequently sentenced to twenty years of

imprisonment. A summary of the pertinent facts follows.

---

[1]Unless rebutted by clear and convincing evidence, findings of fact made by the state courts are presumed to be correct. *See* 28 U.S.C. §2254(e)(1), *see also Foster v. Schomig*, 223 F.3d 626, 631 (7th Cir. 2000).

On the evening of January 5, 1998, Aaron Williams ("Williams") and Douglas Davis ("Davis"), an off-duty peace officer employed by the Cook County Sheriff, were standing in front of Williams' home talking. As they were talking, a man wearing a black leather jacket with a hooded garment underneath and jeans approached. Both men testified at trial that Petitioner was that man. Both also testified that they looked at Petitioner's face as he approached them and Davis asked Williams whether he knew him, to which Williams responded that he did not. Petitioner, armed with a firearm, directed Davis and Williams to "lay it down." Williams testified that he saw Petitioner's face from a distance of about six feet and that he saw him fire his weapon. However, he also testified that he was running when the shooting began. Davis testified at trial that he also looked at Petitioner's face as he approached from a distance of about ten feet away. Before trial, Davis maintained that he had never seen Petitioner before the January 5th incident, but upon cross-examination he admitted that he had told a prosecutor that he had seen Petitioner on an occasion prior to January 5th.

Petitioner fired at Williams first, which gave Davis an opportunity to run behind a tree. Davis then announced that he was "Police." Davis testified that there was a second shooter in addition to Petitioner. Davis returned fire at Petitioner and struck him in the leg. Petitioner and the other shooter then escaped into an alley. Several hours after the shooting, Davis viewed a physical lineup but did not identify any of the participants as an assailant. However, later on, he viewed a photo array in which one of the photos was of Petitioner. Davis identified Petitioner as the assailant who wore the "hoodie" underneath a black leather jacket and jeans and who he had shot in the leg. Williams also viewed a photo array containing the same photos viewed by Davis and he also identified Petitioner as the assailant.

Celestine Baymon-Stewart ("Stewart") testified at trial that she lived across the street from Williams and was sitting on her porch at the time of the incident. She testified that she saw people walking across the street, then she heard gunshots and yelling. She saw someone run from the scene and two others run to opposite trees and shoot at each other. She saw a light colored fancy luxury car with shiny wheels back down the street into the alley. She then saw one of the shooters limp off in the direction of the car. She also saw the second shooter initially run after the first shooter but then reverse direction and run away.

The parties stipulated that a supervisor of the Chicago Police Department's communications division would testify to the fact that several 911 calls were made from the same area as the shooting between 10:55 pm and 10:59 pm. They also stipulated to the testimony of a chemist who would have stated at trial that DNA taken from a Mercedes-Benz (which Petitioner and his accomplices admit to driving the night of the incident) and the clothing of Donald and Scott Blakney belonged to the Petitioner.

Officer Gregory Swiderek ("Swiderek") testified that on the evening of January 5, 1998 around 11:00 pm, he was patrolling in an unmarked police car in the vicinity of Cook County Hospital. He saw a young African-American man running from the direction of the hospital towards Ashland Avenue. When the man saw Swiderek he stopped running and hailed a taxi. Two more African-American males who were running along Ashland Avenue stopped by the taxi and then all three men entered the vehicle. Swiderek observed the taxi driving at a high rate of speed so he decided to follow it. Ultimately, Swiderek stopped the taxi at 535 N. LaSalle Street, a few miles away from Cook County Hospital. When the three men exited the taxi, Swiderek recovered a .38 caliber blue steel revolver loaded with five live rounds of ammunition,

two live rounds of .9 millimeter ammunition were also found.  Swiderek then placed the three men under arrest.

The three men were Scott Blakney, Donald Blakney and Harry McGee.  Swiderek recovered five more live rounds of .9 millimeter ammunition from Harry McGee's coat pocket and the key to a Mercedes Benz automobile from Donald's pants.  Swiderek noticed what appeared to be two large blood stains on Donald's pants.  The three men informed him that they had been with the Petitioner, that Petitioner had been shot, and that they had just dropped him off at Cook County Hospital.

Evidence technician, Edwin Jones, testified that he recovered from the scene of the shooting spent casings from semi-automatic .9 millimeter guns, .45 caliber casings and one full round of .40 caliber ammunition.  Detective William Whalen testified at trial that he observed a 1992 Mercedes Benz parked near an entrance into Cook County Hospital on June 6, 1998.  He observed a bullet hole in the driver's side door and the rear passenger door and blood inside the vehicle.  Forensic investigator, John Paulson, testified that he processed the Mercedes Benz at the Area Five garage on January 6, 1998.  He also testified that there were single bullet holes in the driver side door and the rear passenger side door.  He testified further that there was a .9 millimeter cartridge case inside the vehicle.

Officer Sam Cirone testified that he conducted separate lineups with Donald Blakney, Scott Blakney and Harry McGee for Davis and Williams.  Neither man identified anyone in the lineup as the shooter.  Cirone then went to Cook County Hospital to visit Petitioner.  He inventoried Petitioner's clothing- a leather jacket, a black and grey hooded sweatshirt, bloody gym shoes and a single gym shoe.  He also took a Polaroid picture of Petitioner.  Cirone took

that photo back to the police station and placed it in photo arrays for Davis and Williams to view separately. Both men identified Petitioner as the assailant who approached them and began shooting.

Officer Deirdre Heraty testified that on the morning of January 2, 1998, she found two automatic handguns near bushes around 700 South Ashland Avenue. The first was a Browning .9 millimeter that contained thirteen live rounds of ammunition and the second was a .40 caliber Glock that contained six live rounds of ammunition. The parties stipulated that a forensic scientist would testify that the .9 millimeter shell casing found in the Mercedes-Benz was fired by the .9 millimeter handgun found by Officer Heraty.

Nurse Laura Cleofe testified that she was working in the trauma unit of the Cook County Hospital on the evening of January 5, 1998 and her records indicated that Petitioner was admitted at 10:50 pm that evening. Dr. Kimberly Joseph testified that she examined Petitioner on the evening of January 5, 1998 and that she made her first notation around 11:53 pm. She also stated Petitioner had a gun shot wound to the ankle area of his right foot.

Petitioner testified that he did not shoot at Davis and Williams and was not at the scene of incident the evening of January 5, 1998. Instead, he testified that he was in the Mercedes-Benz with his two brothers and Harry McGee driving near Polk Street and Independence Boulevard when a man began shooting at his car, that he was struck by a bullet and that his brother Donald returned fire. He testified further that he stopped the car, allowed Scott Blakney to assume the wheel and then the group continued to Cook County Hospital where Petitioner was left.

Before the trial, Petitioner made a motion to suppress the identification of Davis and Williams from the photo arrays asserting illegal search and seizure by the Chicago police. During the trial, both Davis and Williams identified Petitioner as the shooter and would-be robber by pointing him out as he sat at defense counsel's table. After the trial, Petitioner filed a motion to have a bullet fragment found in his leg compared to fragments known to have come from Davis' gun and a motion for a new trial due to 1) William's partial recantation of his testimony, 2) the unnecessary suggestiveness of the identification evidence and 3) the unconstitutional search and seizure committed by the police while Petitioner was being treated in the emergency room of Cook County Hospital. The trial court denied Petitioner's motion for a new trial. Petitioner later filed another motion for a new trial based on the findings of a doctor, Dr. Robert Kirshner, concerning Petitioner's gunshot wound. This motion was also denied. Petitioner attempted to make an offer of proof concerning Dr. Kirshner's photographic evidence upon which he relied to form his expert opinion but the court denied Petitioner's request.

Petitioner appealed his conviction to an Illinois Appellate Court. His grounds for appeal were that the trial court erred when it: 1) denied his motion to suppress identification based on illegal search and seizure, 2) denied his motion to suppress identification based upon witness' viewing an unnecessarily suggestive and unfair photo array, 3) allowed unduly suggestive in-court identifications of him, 4) convicted Petitioner in spite of what Petitioner characterizes as the State's failure to produce evidence establishing guilt beyond a reasonable doubt, 5) sustained the State's objection to his commenting on the supposedly unfair and suggestive photo array, 6) denied his post-trial motions, and made certain evidentiary findings (which will be discussed in detail later).

The Appellate Court affirmed the trial court on all grounds. The Petitioner requested the court for a rehearing, and that request was also denied. Petitioner then filed a petition for leave to appeal with the Illinois Supreme Court alleging the following : 1) that the lower courts misapplied controlling federal and state law when they concluded Petitioner had no expectation of privacy in his hospital room at Cook County Hospital, 2) that he was denied due process of law when the in court and photo array identifications were allowed into evidence, 3) that the issue of suggestive identification was not waived, 4) that he was denied due process of law when the trial court a) denied his request for a hearing to present exculpatory scientific evidence relating to his wounds and how they related to his guilt, b) denied his request for a test to determine whether bullet fragments in his leg came from Davis' gun, and c) for a hearing to determine whether Williams' post-trial allegation that the police influenced his identification of Petitioner was credible. The Illinois Supreme Court denied the petition for leave to appeal on May 26, 2004.

On or about December 7, 2004, Petitioner filed the instant habeas petition in this Court. In his federal habeas petition, Petitioner claims the following: 1) that he was denied due process when unnecessarily suggestive photo arrays and in-court identifications were allowed into evidence, 2) that the appellate court misapplied a rule announced in an Illinois Supreme Court case when it held that the in-court identification challenge was waived, 3) that he was denied due process when the trial court a) denied his request for a hearing to present exculpatory scientific evidence relating to his wounds and how they related to his guilt, b) denied his request for a test to determine whether bullet fragments in his leg cam from Davis' gun, and c) denied his request for a hearing to determine whether Williams' post-trial allegations that the police influenced his

identification of Petitioner during the photo array and that he was not sure that Petitioner was the shooter was credible, and 4) that the Illinois trial and appellate courts misapplied controlling federal and state law when they held that Petitioner had no reasonable expectation of privacy in the hospital room where he was treated when the police took his picture.

## **HABEAS CORPUS STANDARDS**

Federal courts may not grant a writ of habeas corpus to a prisoner held under a state court judgment unless custody of the prisoner violates the Constitution, laws, or treaties of the United States. 28 U.S.C. §2254(a); *Mahaffey v. Schomig*, 294 F.3d 907, 914 (7th Cir. 2002). Before a federal court may grant a habeas petition, the petitioner must exhaust his or her state remedies. *Mahaffey*, 294 F.3d at 914-915. This occurs when: (1) the petitioner has presented claims to the highest court of the state; or (2) the petitioner has no remaining state remedies available at the time that the petition is filed. *See Farrell v. Lane*, 939 F.2d 409, 410-11 (7th Cir. 1991), *cert. denied*, *Farrell v. McGinnis*, 502 U.S. 944 (1991).

In addition, a habeas petitioner must comply with state rules regarding procedural default. *Mahaffey*, 294 F.3d at 915. Procedural default occurs either when: (1) a petitioner fails to raise an issue on direct appeal or post-conviction review, *see Farrell*, 939 F.2d at 410; or (2) the state court clearly relies on a state procedural bar as an independent basis for its denial of relief, *see Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). In order to avoid procedural default, a petitioner must fairly present the claim "at each and every level in the state court system…" *See Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). As the Seventh Circuit has noted, "[a] habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at *each*

*level* of state court review has procedurally defaulted that claim." *Lewis*, 390 F.3d at 1026

(internal citations omitted) (emphasis added). If a petitioner has procedurally defaulted on any

given claim, this Court can only grant relief if: (1) there is adequate cause for his failure to raise

the claim in state court and prejudice resulting from the default; or (2) default would result in a

"fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

To prevail on the merits, a habeas corpus petitioner must show that adjudication of the

case: (1) was contrary to, or involved an unreasonable application of, clearly established federal

law as determined by the United States Supreme Court; or (2), was based on an unreasonable

interpretation of the facts in light of the evidence presented in the state court proceedings. 28

U.S.C. §2254(d). The first ground pertains to pure questions of law. *See Lindh v. Murphy*, 96

F.3d 856, 868-69 (7th Cir. 1996), *rev'd on other grounds*, 521 U.S. 320 (1997). The second

ground pertains to mixed questions of law and fact. *Id.* at 870. To warrant relief, the state court

error must be "grave enough to be called 'unreasonable,'" *id.,* meaning that the decision will

stand if it is "one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742,

748-49 (7th Cir. 1997). A state court's application of Supreme Court precedent is reasonable if it

is "at least minimally consistent with the facts and circumstances of the case." *Hennon v.

Cooper*, 109 F.3d 330, 335 (7th Cir. 1997), *cert. denied, Hennon v. Cooper*, 522 U.S. 819

(1997). With respect to this second ground, state court factual determinations are presumed to

be correct unless Petitioner can rebut that presumption with clear and convincing evidence.

*Mahaffey*, 294 F.3d at 915; 28 U.S.C. §2254(e)(1).

## ANALYSIS

Petitioner offers several possible grounds for habeas relief. Each will be considered separately.

*Ground I*

Petitioner claims that his Fourth Amendment rights were violated when Chicago police entered into a hospital emergency room where he was being treated for a gun shot and took his picture for subsequent use in a photo array. Petitioner contends that the witness identifications made from the photo arrays should have been excluded from use at his trial.

The first issue that a district court must always determine when faced with habeas petitions is whether the court can reach the claim. In *Stone v. Powell*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." 428 U.S. 465, 494 (1976). The Seventh Circuit has also explained that the presence of the following three elements establishes "full and fair litigation": "(1) [Petitioner] clearly apprised the state court of his Fourth Amendment claim along with the factual basis for the claim; (2) the state court carefully and thoroughly analyzed the facts, and (3) the court applied the proper constitutional case law to those facts." *Miranda v. Leibach*, 394 F.3d 984, 997 (7th Cir. 2005).

Thus, under the *Stone* standard, a district court is barred from reaching a federal habeas Fourth Amendment claim if the respondent can show the state court(s) considered "the operative facts" of the claim "and analyzed those facts under Fourth Amendment jurisprudence." *United States ex. rel. Maxon v. Page*, 211 F. Supp. 2d 1093, 1097 (N.D. Ill. 2002). If the state court based its holding on facts that lack support, the *Stone* standard of "an opportunity for full and fair

litigation" will not be deemed satisfied. *Id*. However, *Stone* requires only an opportunity for litigation, not a correct outcome.

Consequently, "mistakes in a state court's treatment of a Petitioner's Fourth Amendment claim are not sufficient, in and of themselves, to surmount the *Stone* bar." *Leibach*, 394 F.3d at 998 (citations omitted). An attack on the merits of a state court's decision does not "demonstrate that the state courts deprived [Petitioner] of the opportunity to litigate claims." *Page*, 211 F. Supp. 2d at 1097. When dealing with the merits of a claim, only "egregious errors" by the state court may provide sufficient basis for raising claims previously heard in state court again in federal court. *Leibach*, 394 F.3d at 998.

In the instant case, the state courts considered the same Fourth Amendment claims raised by Petitioner in his habeas petition. The analysis by the Appellate Court of Illinois meets the *Stone* standard as outlined in the three-prong test developed by the Seventh Circuit in *Leibach*. 394 F.3d at 997. First, Petitioner raised on direct appeal the same operative facts for his Fourth Amendment claims as he now asserts, and he has not introduced any new evidence in his habeas petition. (*See* Modified Order Upon Denial of Rehearing, Ill. App. Ct. at 13–17, Nov. 26, 2003.) Second, the state court thoroughly analyzed the factual basis for Petitioner's contentions, devoting almost four pages of its opinion to his claim. (*See Id*.) Finally, the state court applied the appropriate case law regarding the meaning of seizure and requirement of standing for Petitioner's Fourth Amendment claims. (*See Id*.) For example, the Illinois appellate court explained that Petitioner had to show a legitimate expectation of privacy in the premises searched in order to have standing. (Modified Order at 14.) The court concluded that Petitioner did not have such an expectation due to the fact the hospital was public, he had no right to

exclude anyone from the premises, and that police officers frequently entered and exited the premises of their own accord and when summoned by hospital staff who suspected patients had been involved in criminal activity. (Modified Order at 15.) The court also recognized that the Illinois Supreme Court held that the taking of a photograph is not a seizure. *See People v. Gacy*, 468 N.E.2d 1171, 1179, 103 Ill.2d 1, 25 (1984). Petitioner has received, at state court, the opportunity for full and fair litigation, and so Petitioner is barred from raising these Fourth Amendment claims in his habeas petition.

But in the interest of completeness, even if Petitioner's Fourth amendment claims were not procedurally barred by *Stone*, which they are, they would fail on the merits. First, the Illinois Appellate Court was correct when it held that Petitioner had no standing to challenge the taking of his photograph and second, the taking of a photograph does not constitute a seizure within the meaning of the Fourth Amendment.

One must have standing to bring a Fourth Amendment claim. The Supreme Court has held that "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (citations omitted). The Fourth Amendment explicitly protects the privacy in homes, and with limited application, courts have extended that expectation of privacy to other dwelling areas. *See Minnesota v. Olson*, 495 U.S. 91, 98–99 (1990) (staying overnight in hotel afforded the individual with the kind of privacy expectation Fourth Amendment protects); *Jones v. United States*, 362 U.S. 257, 259 (1960) (using a friend's apartment, where clothing was stored and the individual was the sole occupant, created an expectation of privacy that Fourth Amendment protects).

The Supreme Court has also provided factors that suggest no reasonable expectation of privacy exists in this case. In *Minnesota v. Carter*, the Supreme Court concluded that commercial property is different from residential property in the kind of privacy expectations created. 525 U.S. at 89. The *Carter* Court held that individuals using a piece of commercial property lacked standing to raise Fourth Amendment claims. Contributing factors beyond the commercial purpose of the property were the relatively short inhabitation time and the absence of any previous connection between the users of the space and the homeowner. *Id.*

In this case, Petitioner lacks standing to raise any Fourth Amendment claim because no expectation of privacy could have reasonably existed. Petitioner was hospitalized at Cook County Hospital, a public hospital. Nurse Cleofe stated in her testimony noted that police officers often entered the trauma unit where Petitioner was being treated, noting that "they come in and out all the time." (Modified Order at 15.) Also, Illinois law required that medical staff inform authorities of any person who they suspect may have injuries caused by criminal conduct. *People v. Torres*, 144 Ill. App. 3d 187, 190- 191 (1986). Thus, the presence of police officers in the trauma unit was lawful. The legitimate presence of an officer on the premises when a search or seizure occurs is not a sufficient basis to raise Fourth Amendment claims. *Rakas v. Illinois*, 439 U.S. 128, 133 (1978). In addition, Petitioner, as a patient, was not authorized to grant or deny access to anyone, and therefore could not have an objectively reasonable expectation of privacy. Without a reasonable expectation of privacy, Petitioner lacks standing to bring a Fourth Amendment claim.

Furthermore, the taking of a photograph in this instance cannot be deemed a seizure within the meaning of the Fourth Amendment. In *United States v. Emmett*, a criminal appellant

-13-

claimed that a district court erred by not suppressing an identification made from a photo that he claimed was obtained in violation of the Fourth Amendment. 321 F.3d 669 (7th Cir. 2003). The Seventh Circuit upheld the district court's decision not to suppress the identifications and opined that a person has no expectation of privacy in a photograph of his face. 321 F.3d at 672.

## *Ground II*

Petitioner argues that he was denied due process when unnecessarily suggestive photo array identifications and in-court identifications were allowed into evidence. The Illinois appellate court decided Petitioner waived the issue (pursuant to Illinois law as announced in *People v. Enoch*, 522 N.E.2d 1124, 1130-1131, 122 Ill.2d 176, 188 (1988)) of whether the in-court identifications were unnecessarily suggestive because he failed to object to them during the trial. Thus, the government contends that this argument is procedurally defaulted. The state court clearly relied on this state procedural bar in denying appellate relief, so this portion of petitioner's claim may be procedurally defaulted. *See Farrell v. Lane*, 939 F.2d 409, 410 (7th Cir. 1991).[2] Procedural default results in a bar to consideration of the claim for purposes of habeas relief. *See Rodriguez v. Peters*, 63 F.3d 546, 555 (7th Cir. 1995).

However, Petitioner relies on *Ylst v. Nunnemaker* for the proposition that if the "last state court to be presented with [a] particular federal claim reaches [the] merits, it removes any bar to federal court review that might otherwise have been available." 501 U.S. 797 (1991). Petitioner asserts that the Illinois appellate court reached the merits of the in-court identification claims

---

[2] A federal habeas petitioner may still raise a federal claim which has been procedurally defaulted if he can demonstrate adequate cause to excuse his failure to raise the claim in state court and actual prejudice resulting from the default. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Petitioner has made no mention of cause and prejudice in regard to his failure to abide by the Illinois rule governing timely objections.

when it wrote "assuming arguendo that the issue was not waived, the trial court did not err..." (Modified Order at 20.) Given that the state court stated that is was "assuming arguendo," it clearly signaled that portion of its opinion was obiter dicta and the court was not addressing the merits of Petitioner's claim. Thus, this claim is procedurally defaulted.

Nevertheless, Petitioner's claim that the photo array identifications were wrongly admitted into evidence due to their undue suggestiveness is not procedurally defaulted. Prior to his trial, Petitioner asked the trial court to exclude the photo array identifications by Davis and Williams on the grounds that his photograph was the only one with a black background, that his photograph was out of focus as compared to the others and that he was the only participant with a beard, as well as only one of two with any facial hair. At the time of that hearing, Petitioner did not challenge the credibility of Davis or Williams, the two victims who picked Petitioner out of the photo arrays. Thus, the sole question here is whether the Illinois courts' adjudication of the issue: (1) was contrary to, or involved unreasonable applications of, clearly established federal law as determined by the United States Supreme Court; or (2), was based on unreasonable interpretations of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. §2254(d).

The Illinois appellate court recognized that it was the Petitioner's burden to establish that the pretrial photo array was so unduly suggestive that it gave rise to an unreliable identification. In doing so, the appellate court focused on the well known factors that bear on the likelihood that a witness has misidentified a suspect. *Neil v. Biggers*, 409 U.S. 188, 199 (1972). They are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty

demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* The Illinois appellate court cited and applied (albeit cursorily) those same factors in its opinion. (Modified Order at 18 citing *People v. Denton*, 767 N.E.2d 879, 883, 329. Ill. App. 3d 246, 250 (2002).)

Although the Illinois appellate court did not specifically mention how each and every *Biggers* factor weighed in favor of concluding the photo identifications were not tainted, it does not follow that such failure renders the court's conclusion incorrect or unreasonable such that the writ of habeas should be issued. Both witnesses testified to the effect that they paid attention to Petitioner as he approached them. For example, both Davis and Williams testified that they had ample opportunity to view Petitioner during the commission of the crime as they both stated they watched him as he approached with Davis asking Williams whether he knew Petitioner. Further, the trial testimony demonstrates both witnesses were certain that Petitioner was the shooter and this is buttressed by the fact that both witnesses refrained from identifying Petitioner's brothers and friend when they were brought before them. Lastly, only a few hours had passed between the confrontation and the photo array identifications.

The real focus of Petitioner's claim is that the photo array was too suggestive, not that the witnesses were prone to misidentify their assailant under the circumstances of the photo array. The Illinois appellate court recognized that and went on to examine how the factual circumstances surrounding the Petitioner's photo arrays differed from those of other cases and whether Petitioner's photo arrays were constitutionally infirm. (Modified Order at 18-19.) It noted several cases where the photo arrays suffered from the same or more suggestive physical circumstances than those at issue in this case and were still upheld as not so suggestive as to

offend the accused's constitutional rights.  (*See Id.*)

For example, the court cited *People v. Summers*, 49 Ill.App.3d 70, 74, 362 N.E.2d 1347, 1352 (1977), where an Illinois appellate court upheld a photo array in which the defendant's photograph was noticeably darker that the other photos.  The court also cited *People v. Schmitt*, 424 N.E.2d 1267, 1270, 99 Ill.App.3d 184, 185 (1981), where another Illinois appellate court upheld a photo array, this time despite the fact that the defendant's photo was larger than the others in the array and it showed more of his torso than was depicted in the other photos.

Here, Petitioner merely points out that there were differences between his photo and the others given to the witnesses yet he does not sufficiently explain how the trial court's judgment involved an unreasonable interpretation of the facts in light of the evidence presented to it or was contrary to clearly established federal law.  Instead, Petitioner really seeks this Court to act as a direct appellate court and hold that the trial's court's judgment was incorrect.  That is exactly what should not be done on federal habeas review.

<u>*Ground III*</u>

Petitioner claims he was denied *federal* due process when the trial court a) denied his request for a hearing to present exculpatory scientific evidence relating to his wounds and how they related to his guilt, b) denied his request for a test to determine whether bullet fragments in his leg came from Davis' gun, and c) denied his request for a hearing to determine the credibility of Williams' post-trial allegation that the police influenced his initial identification of Petitioner during the photo array.  Respondent argues that these claims are waived because Petitioner failed to raise them in the Illinois appellate court proceedings.  Petitioner contends that he successfully raised these due process claims as plainly evidenced by a sub-heading from his appellate brief

which states "V. Due Process Was Denied when the court..." as well as his citations to some federal cases in a section of his appellate brief entitled "Points and Authorities."

Title 28 U.S.C. §2254(b)(1) requires a state prisoner to exhaust state remedies before seeking the federal writ of habeas corpus. The Supreme Court has explained that exhaustion of State court remedies means allowing the State an "opportunity" to review and correct any violation's of the prisoner's *federal* rights at each level of review. *Baldwin v. Reese*, 541 U.S. 27, 31 (2004). The Court explained further that for a petitioner to be deemed to have given the State courts an "opportunity" to correct federal rights deprivations, he must have "fairly presented" his claims before each appropriate State court "thereby alerting [each] court to the federal nature of the claim. *Id.* (citations omitted). Fair presentation of a claim includes putting forth both the operative facts and the legal authority upon which the claim is based. *Anderson v. Harless*, 459 U.S. 4, 6 (1982).

Petitioner's ambiguous labeling of "due process" and summary citations to federal cases alongside Illinois cases in an appendix to his appellate brief cannot constitute giving the Illinois appellate court a fair presentation of the basis of all of his federal claims. First, Petitioner never identified in his appellate brief the source of the due process rights that he was allegedly denied by the trial court. The Illinois constitution contains a due process clause in its bill of rights just like the federal constitution does, but the legal breadth and dimensions of the respective clauses are not the same such that a claim under one is the same as a claim made under the other.

Second, the Illinois court cases to which Petitioner cited all rely on Illinois law as exclusive authority for their holdings, with the exception of *People v. Jones*, 511 N.E.2d 1215, 157 Ill.App.3d 1006 (1987), which relied on *Napue v. Illinois*, 360 U.S. 264 (1959), where the

United States Supreme Court held that under the Fourteenth Amendment, a conviction based on evidence that the State knows is untrue cannot stand.[3]  In several places in his appellate brief, Petitioner refers to "*our* Supreme Court" when pointing out Illinois cases (see e.g., Appellant's Brief, p. 61) and refers to "the Supreme Court" when introducing federal cases (see e.g., Appellant's Brief, p. 58).  The federal cases cited by the Petitioner (for example, *Strickland v. Washington*, 466 U.S. 668 (1984) (dealing with ineffective assistance of counsel); *Chambers v. Mississippi*, 410 U.S. 284 (1973) (balancing the right to a fair trial with state hearsay rules); *Washington v. Texas*, 388 U.S. 14 (1967) (holding the right to fair trial trumped Texas state law prohibiting co-conspirators from testifying in each other's favor) are largely inapposite to Petitioner's instant due process claims; the exception being *Crane v. Kentucky*, 476 U.S. 683 (1986), where the Supreme Court held that the issue of credibility of a witness <u>at trial</u> is important enough to the right to a fair trial that it warrants inclusion of evidence of such credibility even where it was previous disallowed for a wholly separate reason.

Thus, except for the credibility issue, the contours of Petitioner's due process claims were either ambiguous because a reviewing court would not have been able to read Petitioner's appellate submissions and discern what legal authorities Petitioner relied upon in support of his claims, or at best, dependent on Illinois cases and Illinois law.  Without a concrete presentation

---

[3] Presumably, Petitioner cited *Jones*, 511 N.E.2d 1215, 157 Ill.App.3d , to support his argument that a determination on witness credibility is necessary when there is an allegation that the State knowingly used false testimony to obtain a conviction.  Therefore, Petitioner is of the opinion the trial court erred when it denied a request for a hearing to test the credibility of Williams, who had stated after the trial that police essentially told him to pick Petitioner's photo in the photo array.  However here, petitioner only alleges officers directed him to pick out petitioner in the photo array and that he was unsure of whether the assailant was actually Petitioner, <u>not</u> that the prosecutors knowingly used false testimony to convict him.

of federal legal authority, Petitioner's submission to the Illinois appellate court cannot constitute a fair presentation of his federal claims.

However, it is reasonably discernable from Petitioner's appellate brief and ancillary submissions that he fairly presented the issue of whether the trial court's decision to deny his request for a hearing to test the credibility of Williams' recantation testimony was a violation of Petitioner's federal due process rights. Not only did Petitioner cite cases that clearly relied on Fourteenth Amendment Supreme Court precedent but he also mentioned in his appellate brief that the trial court's actions were completely inconsistent with those cases. Thus, the Illinois appellate court was fairly alerted to the federal nature of Petitioner's credibility hearing claim and the issue has been properly exhausted for habeas purposes. *See Anderson*, 459 U.S. at 6; *Verdin v. O'Leary*, 972 F.2d 1467, 1473 (7th Cir. 1992).

In support of his argument that denying the request for a hearing to test Williams' credibility was a deprivation of his federal due process rights, Petitioner makes the naked assertion that "law requires a hearing and testimony." However, the Supreme Court has made clear that the right to introduce evidence guaranteed by due process of law is restricted by the litigant's ability to show that circumscription of that right "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (quoting *Patterson v. New York*, 432 U.S. 197, 201-202 (1977).

In *Crane*, the Supreme Court held that the issue of credibility of a witness <u>at trial</u> is fundamental enough to the right to a fair trial that it warrants inclusion of evidence of such credibility even where it was previous disallowed for a wholly separate reason. 476 U.S. 683.

However, that case clearly dealt with a credibility determination during the trial. *Id.* Here, the credibility hearing Petitioner sought was to take place after the trial had already ended, when the right to a fair trial was no longer at issue. Furthermore, the court was not unreasonable in its decision to not hold a credibility hearing. First, a separate eye witness, Davis, also picked Petitioner out of a photo array and identified him as the shooter in court. Second, that Williams may have been helped in identifying Petitioner as the shooter when viewing the photo array has no bearing on the fact that Williams pointed out Petitioner as the shooter in court independently without anyone's influence.

Furthermore, it is not as if the trial court disallowed any evidence of Williams' recantation while deciding whether to grant a new trial. The court reviewed an affidavit submitted by Williams detailing the circumstances which led him to identify Petitioner at the photo array. The Court concluded the recantation was unreliable in light of the fact that it came after Williams' cousin visited the Petitioner in jail.

In short, this Court cannot conclude that the Illinois trial court's decision not to hold a separate credibility hearing after Petitioner's trial had finished was a violation of Petitioner's federal due process rights.

## CONCLUSION

For the foregoing reasons, Petitioner's request for habeas corpus relief is DENIED. This case is closed. All other motions are moot and terminated.

Enter:

/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **August 15, 2008**